# CHARLESTON.

## JOHNSTON *v.* COMMERCIAL BANK.

Submitted June 4, 1885.—Decided December 8, 1885.

1. It is an established rule of commercial law, that the drawee of a bill of exchange is presumed to know the hand-writing of the drawer, and *a fortiori* the maker of a negotiable note is presumed to know his own signature ; and if the drawee accepts or· pays the bill, or the maker pays the negotiable note in the hands of a *bona fide* holder, although the drawer's or maker's name has been forged, he is bound by the act and can not recover back the money so paid.

*A. J. Clarke* for plaintiff in error.

*Caldwell & Caldwell* for defendant in error.

JOHNSON, PRESIDENT :

On September 3, 1884, B. R. Johnston brought in the municipal court of Wheeling an action of trespass on the case in *assumpsit* against the Commercial Bank of Wheeling, to recover the amount of a note, $225.00, which purported to have been signed by said B. R. Johnston, payable to the order of Philip Metzner, and negotiated by said bank, and after maturity paid by said supposed maker, who afterwards discovered that his signature thereto was a forgery. The declaration contained the common counts in *assumpsit*, no special count.

The defendant demurred to the declaration, which demurrer was overruled, and the defendant pleaded *non-assumpsit.* The case was tried before a jury and verdict was rendered for the plaintiff. The defendant moved to set aside the verdict and grant it a new trial, which motion was overruled, and judgment was entered on the verdict. The defendant took a bill of exceptions to certain rulings of the court, which bill certifies all the evidence in the case.

The evidence shows that the note was endorsed by Philip Metzner, to whose order it was payable, and negotiated at the Commercial Bank. The note was further endorsed: "Pay Bank of Ohio Valley or order for collection as at Commercial Bank, Wheeling, West Virginia. S. P. Hildreth, Cashier." Also, "Pay to J. R. Mitchell or order for collection for Bank of the Ohio Valley, Wheeling, West Virginia, F. P. Jepson, Cashier." The evidence further showed, that the plaintiff, B. R. Johnston, was a dealer in furniture in St. Clairsville, Ohio, buying for some years past his furniture from the Riverside Furniture Company in Wheeling, of which said Philip Metzner was president. Johnston had at different times given his notes to the furniture-company for his purchases. About October 25, 1883, Metzner presented to the Commercial Bank, where his own and the furniture company's business was done, a note for $225.00 at four months, dated October 25, 1883, payable to the order of said Metzner, purporting to have been made by said B. R. Johnston, and asked that it be discounted, and in the usual course of business it was discounted, and Metzner drew for the proceeds. The note fell due February 28, 1884, and in January, 1884, it was sent to the Bank of the Ohio Valley for collection, and by it sent to the First National Bank of St. Clairsville, its correspondent, for collection. Johnston was notified by the First National Bank of St. Clairsville of the note being there for collection, and his attention was called to it as a "furniture-company note" before it fell due; but being short of money he did not pay it. It appears there was nothing to prevent him seeing the note. It was sent back to Wheeling unpaid after March 6, 1884. About the middle of March the cashier of the defendant wrote Johnston reminding him of his note, and that it was past due and asking payment. Johnston did not reply, and on March 31, 1884, his team being found in Wheeling in charge of his son, was seized on attachment sued out by the bank. The son informed his father of the attachment by telegraph. The dispatch was by Johnston shown to the cashier of the First National Bank of St. Clairsville; and at Johnston's instance the cashier telegraphed to Hildreth, cashier of the defendant bank, to send the note to the First National Bank of St. Clairsville, and it

would be paid.   On April 1, the note was sent by the Bank of the Ohio Valley, to the St. Clairsville bank, and was received after banking hours, and on April 2, it was paid by Johnston.   Upon the receipt of the telegram from the cashier of the St. Clairsville bank, the attachment was released.

Johnston says: "According to my directions he, Mitchell, (the cashier,) paid the note."   Johnston, himself, did not see the note until possibly four or five days after April 1, when he went to the First National Bank of St. Clairsville and got possession of it.   Metzner went with young Johnston, after the team was levied on under the attachment, to the telegraph-office, where the son sent his father the despatch.   Metzner gave young Johnston a note for $241.00 dated March 31, 1884, and told him to give it to his father, which he did on April 1.   Johnston received the note on April 1, but did not understand it.   This was before the forged note was paid by Johnston.   On taking the note home, which he had paid, Johnston discovered, that the name of the "Riverside Furniture Company" as payee was not in the note.   The notes had been theretofore made payable to the order of the company, but Philip Metzner was the payee in this note, and he discovered that his signature thereto was a forgery.   Mitchell, the cashier, knew Johnston's signature well.   Johnston had for several years kept an account in the First National Bank of St. Clairsville, of which bank Mitchell was cashier.

Mitchell in his evidence says : "I never looked at the note, until Johnston brought it to me, after it was paid.   On April 9, Johnston went with his attorney, Judge Carroll, to Wheeling, and went to the Commercial Bank for the purpose of finding out, for whom the note had been discounted, and found it had been discounted for Metzner.   Nothing was said at the bank at that time about the note being a forgery. They went from the bank to the office of The Riverside Furniture Company und examined its books to see if there was any indebtedness there of Johnston's corresponding in time and amount with the $225.00 note, and found no such indebtedness.   They then went to Metzner's house, saw him there sick, charged him with the forgery of the note and told him they wanted money or security.   He asked for time until Saturday, April 12, to fix it up, and said by that time

he could and would do it; and the time was given. They did not inform the bank of the forgery, nor that they had given time to Metzner to fix it up.

Judge Carroll in his evidence says: "Johnston got a despatch from Metzner's son on April 11, that his father could not fix up the matter by Saturday and asking delay until the next Monday, April 14. I answered at Johnston's request giving him the time."

Metzner died on the evening of April 11. On April 15, the day after the day to which Johnston had extended time to Metzner to fix the matter up, Johnston went to the Commercial Bank and said that Metzner had acknowledged the $225.00 note to be a forgery, and demanded repayment of the money by him paid on the forged note. The bank declined to pay the money back. The evidence tended to prove that Metzner died insolvent.

The defendant by counsel asked the court to give the following instructions:

"No. 1. If the jury believe from the evidence that the plaintiff on the fourth or fifth of April, 1884, knew the forgery of his name to the note mentioned as paid by mistake by him on April 2, 1884, and that he failed to notify the defendant of said forgery till the fifteenth day of April, following and to demand a re-payment of the money, that then by reason of this delay he is not entitled to recover in this suit.

"No. 2. If the jury believe from the evidence that the defendant discounted the note in this suit mentioned and received the same in their regular course of business in good faith and for value, and did not know or have any reason to suspect that the plaintiff's name as maker was forged to said note when defendant discounted the same, and that said note was paid by plaintiff or by his agent, to the defendant on or about April 2, 1884, that then and in that event the plaintiff is not entitled to demand back the money so paid and cannot recover in this suit.

"No. 3. If the jury believe from the evidence that after the plaintiff discovered that his name to the said note in this suit as maker had been forged by the payee, Phillip Metzner, and that the plaintiff without the knowledge or consent of the defendant entered into negotiations with said Metzner, for the

re-payment of the money paid by plaintiff to the defendant on said note, and without the knowledge or consent of the defendant gave time to said Metzner to arrange for and make said re-payment to the plaintiff, that then and in that event the plaintiff must be held as having adopted said forged note as his own and said Metzner as his debtor and that he must look to said Metzner for re-payment, and is therefore, not entitled to recover in this suit.

"No. 4. That under all the circumstances of this case as made by the plaintiff's own evidence, he is not entitled to recover."

And the court refused to give said instructions and each of them and the defendant excepted.

After the jury had been out some time and failing to agree, on motion of the planintiff against the objections of the defendant, the court gave the jury the two following instructions, and the defendant again excepted.

" No. 1. Where a person's name is forged to a note, it is a nullity as to him, but if such a note is presented to him by an innocent party for payment, and alleged to be genuine, and he after inspection recognize it as such and pays the same, he can not recover back the money paid although the note be a forged one. It is well settled that every party is bound to know his own signature, and if he make a mistake (after inspection) in recognizing a forged signature to a note as his own, he can not recover back the money paid to a *bona fide* holder without notice of such signature being a forgery prior to payment; but money paid under a mistake of fact may be recovered back though the party paying may have been negligent in making the mistake, unless the payment has caused such change in the position of the party paid as would be unjust to require him to refund. Where a party by mistake pays (or orders to be paid) money on a note, supposing it to be genuine, to which his signature has been forged and he has no knowledge of such forgery, and he has never seen or inspected the note, he may recover back the money paid provided he has not contributed to the mistake himself by his own fault or negligence, and provided by a sufficiently early notice he has enabled the party to whom the payment was made to indemnify himself as far as possible.

Mere space of time is not important, provided that it be clearly shown that the party to whom the payment was made will be put to no more liability, trouble or expense by a restoration than he would have been called upon on or at the time of payment. If the jury believes from the evidence that the note known in the trial as the forged note, was a forgery, and that plaintiff at the time he ordered the bank at St. Clairsville to pay the same supposed and believed it to be his genuine note, and had never seen or suspected the same prior to its payment, and did not discover or have knowledge of the forgery until he had seen and examined it, and that he, plaintiff, gave due and reasonable notice of such forgery to the defendant, and that the defendant was not in any different position to protect itself from loss (by reason of such forgery) at the time it received notice of the forgery of the note than it would have been had it had notice or knowledge of such forgery on the day such notice could have been given it, the verdict should be for the plaintiff.

"No. 2. But if the jury believes from the evidence that the defendant did not have any knowledge of the forgery until notified by plaintiff, and that the plaintiff by delay or neglect in giving notice to it of such forgery, has caused it to be placed in such position that it could not have saved itself from loss and protected its rights and interest at the time it did receive knowledge or notice of such forgery as well and as fully as it could have done if it had received such knowledge or notice on the day plaintiff could have given it such notice, the verdict should be for the defendant."

And the jury having rendered a verdict as in this record is hereinbefore set forth, the defendant moved the court to set aside said verdict and grant it a new trial, which motion the court overruled, and to which ruling the defendant then and there excepted and presented this its bill of exceptions and asked that it be signed, sealed and made part of the record, which was accordingly done.

Under these circumstances can the defendant, the Commercial Bank, be required by law to pay back the money so paid on said forged note?

The leading case on the subject, so regarded in all the books, is *Price* v. *Neal,* decided in 1762, 3 Burr. 1354. It

was an action on the case brought by Price against Neal, wherein Price declares that the defendant, Neal, was indebted to him to £80 for money had and received to his, plaintiff's, use, and damages were laid at £100. It was proved at the trial, that a bill was drawn as follows : "*Leicester*, 22d *November*, 1760. Sir:—Six weeks after date pay Mr. *Roger Reeding*, or order, forty pounds, value received, for Mr. *Thomas Ploughfor*, as advised by, sir, your humble servant, *Benjamin Sutton*. To Mr. *John Price* in *Bushlane, Cannon street, London*. Indorsed : *R. Reeding, Antony Topham, Hammond* and *Larocke*. Received the contents, *James Watson & Son*; witness, *Edward Neal*;" that this bill was *indorsed to the defendant* for a *valuable consideration* and *notice* of the bill was left at the plaintiff's house on the day it became due. Wherupon the plaintiff *sent his servant* to call on the defendant to *pay him* the said sum of £40 and *take up said bill*, which was done accordingly; that another bill was drawn as follows : "*Leicester*, 1st *February*, 1761. Sir:—Six weeks after date pay Mr. *Roger Reeding*, or order, forty pounds, value received, for Mr. *Thomas Ploughfor*, as advised by, sir, your humble servant, *Benjamin Sutton*. To Mr. *John Price*, in *Bushlane, Cannon street, London*;" that this bill was indorsed : "*R. Reeding, Thomas Watson & Son*. Witness for *Smith, Right & Co*;" that the plaintiff accepted this bill by writing on it, "*accepted, John Price*," and that the plaintiff wrote on the back of it : "*Messrs. Frame* and *Barclay*, pray pay forty pounds for *John Price*;" that this bill being *so accepted* was *indorsed to the defendant* for a *valuable consideration*, and left at his banker's for payment and was *paid by order of the plaintiff* and *taken up*.

"Both those bills were *forged* by one *Lee*, who has been since *hanged for the forgery*. The defendant, *Neal*, acted *innocently* and *bona fide*, without the least privity or suspicion of the said forgeries or either of them, and *paid the whole value of those bills*. The jury found a verdict for plaintiff and assessed damages £80, and costs £40, subject to the opinion of the court on this question : 'Whether the plaintiff, under the circumstances of the case can *recover back* from the defendant the money he paid on the said bills or either of them ?' Mr. *Stowe* for the plaintiff argued that he ought to recover

back the money in this action, as it was paid by him by *mistake only*, on supposition that those were true, genuine bills, and as he could never recover it of the drawer, because in fact no drawer exists, nor against the forger, because he is hanged. Mr. Yates, for the defendant, argued, that the plaintiff was not entitled to recover back this money from the defendant. He denied it to be a payment by mistake and insisted that it was rather owing to the negligence of the plaintiff, who should have enquired. and satisfied himself, 'whether the bill was really drawn on him by Sutton or not.' Here is no fraud in the defendant, who is stated to have acted innocently and *bona fide* without the least privity or suspicion of the forgery and to have paid the whole value of the bills. Lord Mansfield stopped him from going on, saying :

' This is one of those cases that can never be made plainer by argument. It is an action on the case for money had and received for the plaintiff's use, in which action the plaintiff can not recover the money back, unless it be against conscience in the defendant to retain it ; and great liberality is always allowed in this sort of action. But it can never be thought unconscientious in the defendant to retain this money, when he has once received it on a bill of exchange, rendered to him for a fair and valuable consideration, which he had *bona fide* paid without the least privity or suspicion of any forgery. Here was no fraud, no wrong. It was incumbent on the plaintiff to be satisfied that the bill drawn upon him was the drawer's hand before he accepted or paid it, but it was not incumbent on the plaintiff to enquire into it. Here was notice given by the defendant to the plaintiff of a bill drawn upon him ; and he sends his servant to pay it and take it up. The other bill, he actually accepts ; after which acceptance the defendant innocently and *bona fide* discounts it. The plaintiff lies by for a considerable time after he has paid these bills, and then found out they were forged, and the forger comes to be hanged. He made no objection to them at the time of paying them. Whatever neglect there was, was on his side. The defendant had actual encouragement from the plaintiff himself for negotiating the second bill, from the plaintiff's having without any scruple or hesitation, paid the

first, and he paid the whole value *bona fide.* It is a misfortune which has happened without the defendant's fault or neglect. If there was no neglect in the plaintiff yet there is no reason to throw off the loss from one innocent man upon another innocent man; but in this case if there was any fault or negligence in any one it certainly was in the plaintiff and not in the defendant.' "

In *Smith* v. *Mercer,* 6 Taunt. 76 (1 E. C. L. 312), the defendant took a bill accepted payable at the plaintiffs', who were the drawer's bankers and endorsed it to their, the defendants' agents, to whom the plaintiffs paid it when due, and seven days after sent it as their voucher to the drawee, who apprized them, that the acceptance was forged. It was held by three judges, Dallas, Heath and Gibbs, C. J. against Chambre, J., that the plaintiffs could not recover from the defendants the amount which they had thus paid them on the forged acceptance. Dallas, J., said : " And though the facts are not precisely the same, I think the case of *Price* v. *Neal,* 3 Burr. 1354, and 1 Bl. 390, furnishes a rule, which ought to govern the present." Gibbs C. J., said : " A narrow and particular ground is with me conclusive in this case. If the acceptance had been genuine and the plaintiffs had refused payment, the defendants had their remedy against the supposed acceptor ; or if they failed to obtain the amount from him, they had their remedy against the prior parties on the bill. The acceptance carried with it an order on the bankers of the supposed acceptor to pay the money. It purported to be an order of *Evans,* whose banker the plaintiffs were. It was incumbent on them to see to the reality of that order before they obeyed it, and if by obeying it they are the sufferers, they ought not to throw on another a loss occurring without fault of his. See the circumstances : The defendants present the bill for payment, and it is paid to them. The money remained in their hands, without demand made on them for it, from the 23d of April till the 30th of April ; the forgery being then discovered the plaintiffs demand it back from the defendants. If the plaintiffs had originally refused to pay this money, the holder would immediately have given notice to the drawer and to the immediate indorser which would have been transmitted to the first indorser and drawer. In consequence of the bill

being paid the defendants continued to have the money in their hands till the 30th of April. I think it was then too late for the defendants to give notice to the prior parties, and by not having given such notice they lost their remedy against those parties, * * I have put the case on the express point that by the acts of the plaintiffs the defendants are put in a worse situation; but I do not mean thereby to express my dissent from the larger ground on which the case has been put by my brothers Heath and Dallas; but I think the ground on which I have put it is alone a sufficient answer to all the arguments that have been used."

Chambre, J., in his dissenting opinion, said: " The situation of the plaintiffs is extremely material. They are no parties to this bill neither drawees, acceptees or payees. They are not purchasers of the bill; they never had any property in it; they are mere servants and agents of the payees; it is as to them, a payment under a supposed authority which does not exist."

In _Mather_ v. _Maidstone_, 37 Eng. L. & Eq. 339, Jervis, C. J. said: " As a general rule the holder of a bill of exchange is entitled to know whether the acceptance is genuine and whether it will be paid by the acceptor. If the acceptor pays it, he can not afterwards recover the money back, if he has, at the time he pays it, the means of satisfying himself of his liability to pay it, even though it should turn out that the acceptance is a forgery. Here instead of paying money for the bill, the acceptor gave another bill, but I think that can make no difference. * * The defendant, after the bill had come into his hands, and after he had had an ample opportunity of inspecting it, kept it and gave a fresh bill at three months; and after an interval of one month, he discovered that the acceptance of the original bill was a forgery, and he said that he was not liable on it, and offered to return it, so as to put the plaintiff in the same condition, as he was in, a month before, the plaintiff having been all that period deprived of his remedy against the other parties liable on the bill. Under these circumstances the defendant can not be allowed now to say the acceptance was not in his hand-writing." (See _Levy_ v. _Bank of the United States_, 4 Dallas 234.)

In _U. S. Bank_ v. _Bank of Georgia_, 10 Wheat 33, it was

decided that in general a payment received on forged papers or in base coin is not good; and if there be no negligence in the party, he may recover back the consideration paid for them or sue upon his original demand; but that this principle does not apply to a payment made *bona fide* to a bank in its own notes, which are received as cash and afterwards discovered to be counterfeit; that in case of such a payment on general account an action may be maintained by the party paying the notes, if there is a balance due him from the bank upon their general account. Mr. Justice Story in delivering the opinion of the court, affirms the decision of *Price* v. *Neal*, *supra*, and says: "The case of *Neal* v. *Price* has never since been departed from, and in all the subsequent decisions, in which it has been cited, it had the uniform support of the court and has been deemed a satisfactory authority." The Court in this case also approved the decision in *Gloucester Bank* v. *The Salem Bank*, 17 Mass. 33, and approvingly quotes the following from Parker, chief justice, in that case:

"The true rule is that the party receiving such notes, must examine them as soon as he has opportunity, and return them immediately. If he does not he is negligent, and negligence will defeat his right of action. This principle will apply in all cases where forged notes have been received, but certainly with more strength, when the party receiving them is the one purporting to be bound to pay. For he knows better than any other whether they are his notes or not, and if he pays them or receives them in payment, and continues silent after he has had sufficient opportunity to examine them, he should be considered as having adopted them as his own." Referring to the case from 17 Mass. and *Price* v. *Neal*, and other authorities by him cited, Mr. Justice Story says: "Against the pressure of these authorities there is not a single opposing case; and we must therefore conclude that both in England and America, the question has been supposed to be at rest."

In *Bank of St. Albans* v. *Farmers' & Mechanics' Bank*, 10 Vt. 145, the court by Phelps, judge, said: "The case of *Price* v. *Neal*, is now understood to have proceeded upon the ground, that the drawee is bound to know the handwriting of his correspondent, and thus understood, its authority has

never been questioned. It has often been commented on both in the English courts and those of this country, and although its applicability to a transfer of a forged security between persons not parties to it has been questioned, yet its authority as applied to the case of such a bill, accepted or paid by the drawee, has been uniformly and fully sustained. That the rule thus adopted extends as well to the case of a bill paid upon presentment, as to one accepted and afterwards circulated, appears not only from the case itself but from subsequent decisions, in which the case itself has been approved and its principle adopted. There is good reason for the declaration, upon which the authority of that case rests, to be found in the intrinsic character of the transaction itself. The presentment of a bill to the drawee, is a direct appeal to him to sanction or repudiate it. It is an inquiry as to its genuineness addressed to the party, who of all men is supposed to be best able to answer it, and whose decision is most satisfactory. He is moreover the person, to whom the bill points, as the legitimate source of information to others; and if he were permitted to dishonor a bill, after once having honored it, the very foundation of confidence in commercial paper would be shaken. There is a wide difference between such a transaction and the passing of paper as a representative of money between persons equally strangers to it in the ordinary course of business. In the latter case the receiver relies in a measure upon the paper, while in the former the case is reversed, and the holder relies and has a right to rely upon the decision of him, to whom the bill is addressed, and who alone is to determine whether it shall be honored or not."

In *Ellis & Morton* v. *Ins. and Trust Co.*, 4 Ohio St. 628, it was held by a majority of the court, that money paid upon a mistake of facts, and without consideration may as a general rule be recovered back; that a well settled exception of this rule occurs, when the payment is made by the drawee of a forged bill or check to a holder for value without fault, and the money can not be returned without prejudice to him; that the exception rests upon the supposed acquaintance of the drawee with the drawer's signature, and the negligence imputed to him for paying the paper, without sufficient in-

quiry as to its genuineness; that this exception does not apply, when either by express agreement or a settled course of business between the parties or by a general custom in the place applicable to the business, in which both parties are engaged, the holder takes upon himself the duty of exercising some material precaution to prevent the fraud and by his negligent failure to perform it has contributed to induce the payee to act upon the paper as genuine and to advance the money upon it; nor does it apply in any case, where the parties are in a mutual fault, or where the money is paid upon a mistake of facts, in respect to which both were bound to inquire; that in a case of money paid upon a forgery not falling within the exception, but being governed by the general rule it is sufficient to give notice, when the forgery is discovered. Thurman, chief justice, and Swan, judge, dissent from the decision. Ranney, judge, in delivering the opinion of the majority of the court, said on page 652 :

"We admit it to be equally well settled, that, where the instrument is drawn upon, or purports to be signed by, the party paying the money, to a holder without fault, and whose situation would thereby be changed t o his prejudice, if he were compelled to refund, the money can not be recovered back. The foundations of the rule are sufficiently obvious. The party is supposed to know his own handwriting, in the one case, or that of his customer or correspondent in the other, much better than the holder can; and the law therefore allows the holder to cast upon him the entire responsibility of determining as to the genuineness of the instrument, and if he fails to discover the forgery, imputes to him negligence, and as between him and the innocent holder compels him to suffer the loss."

In *Commercial and Farmers' National Bank* v. *First National Bank*, 30 Md. 11, the authority of *Price* v. *Neal* is cited and approved.

In *National Park Bank of New York* v. *Ninth National Bank*, 46 N. Y. 77, the complaint stated that on March 25, 1867, The Ridgely National Bank of Springfield, Illinois, drew its draft or bill of exchange on plaintiff for the sum of $14.20 payable to the order of Eli Shirley and delivered the same to the payee; that afterward the amount of said draft was

fraudulently changed to $6,300.00, and the name of the payee to E. G. Fanchon, Esq.; that the name of William Ridgely, cashier, signed to said draft was erased and afterwards re-written by the person making the erasure; that the same was then discounted by the Lexington National Bank and by it was endorsed to defendant; that afterward and on or about April 12, 1867, defendant presented said draft to plaintiff, and said plaintiff paid thereon the sum of $6,300; that plaintiff discovered the forgery May 10, 1867, and forthwith notified the defendant thereof and demanded re-payment of said sum less $14.20, which was refused. Defendant demurred and for ground stated, that complainant did not state a cause of action. The court below overruled the demurrer. Allen, judge, in pronouncing the unanimous opinion of the court, said on page 80:

"For more than a century it has been held and decided, without question, that it is incumbent on the drawee of a bill to be satisfied that the signature of the drawer is genuine; that he is presumed to know the handwriting of his correspondent, if he accepts or pays a bill to which the drawer's name had been forged, he is bound by the act, and can neither repudiate the acceptance nor recover the money paid."

He then refers to and approves *Price* v. *Neal*, and subsequent decisions, affirming the same doctrine, and further says:

"Cases have been distinguished from *Price* v. *Neal*, and its applicability to a transfer of a forged instrument, between persons not parties to it, has not been extended to forgeries of endorsements or handwriting of parties to negotiable instruments other than the drawers. But as applied to the case of a bill to which the signature of the drawer is forged, accepted or paid by the drawee, its authority has been uniformily and fully sustained, and the rule extends as well to the case of a bill paid upon presentment, as to one accepted and afterwards paid. * * A rule so well established and so firmly rooted and grounded in the jurisprudence of the country, ought not to be overruled or disregarded. It has become a rule of right and of action among commercial and business men, and any interference with it would be mischievious. Judge Ruggles in *Goddard* v. *Merchants' Bank, supra,* well says: 'It should not be departed

from or fritted away by exceptions resting on slight grounds, and can not be overruled, without overthrowing valuable and well settled principles of commercial law.'"

The judgment of the court below was reversed, and judgment entered for defendant. The opinion of Ruggles J. in *Goddard* v. *Merchants, Bank,* 4 Comstock 149, referred to by Judge Allen was a dissenting opinion from the majority of the court, who he evidently thought were in that case, "frittering away" by an exception to the general rule, and thus overthrowing " valuable and well settled principles of commercial law." To the same effect is *Stout* v. *Bennett,* 39 Mo. 277; *Young & Son* v. *Lehmon, Darr & Co.,* 63 Ala. 519; *Bernheimer* v. *Marshall & Co.,* 2 Minn. 78, and *Hoffman & Co.'* v. *Bank of Milwaukee,* 12 Wall. 181. I will now refer to some cases cited by counsel for plaintiff, the defendant in error.

The case of *Goddard* v. *Merchants' Bank, supra,* was a case in which it appeared that a forged bill purporting to be drawn by a bank in Ohio was presented to the drawees in New York and payment refused on *Saturday* for want of funds of the drawer. On *Monday* following the plaintiff on being informed of the matter, called at the office of the notary, who had the bill for protest and notice, and left his check for the amount in order to take up the bill for the honor of the drawers. In consequence of the absence of the notary from his office he did not see the bill, but left word to have it sent to his place of business. The notary on the same day delivered the check over to the holder of the bill but did not send the bill to the plaintiff. The plaintiff called again the next day at the office of the notary and on being shown the bill ascertained and pronounced it to be a forgery. It was held by a majority of the court, Ruggles Judge and Jewett Judge dissenting, that under the circumstances the plaintiff was not chargeable with negligence, and that he was entitled to recover the money he had paid on the ground of mistake. To the same effect is *Canal Bank* v. *Bank of Albany,* 1 Hill 287.

The case of *Lawrence et al* v. *American National Bank,* 54 N. Y. 432, only lays down the general rule, that money paid under mistake of fact may be recovered back. That this is the general rule is nowhere doubted.

In *National Bank of Commerce* v. *Banking Association*, 55 N. Y. 211, it is held that a bank is not bound to know the handwriting or genuineness of the filling up of a check drawn upon and paid by it. It is legally concluded only as to the signature of the drawer and its own certification ; therefore, when a bank has paid by mistake to a *bona fide* holder a certified check, which after certification had been fraudulently altered by raising the amount, it can recover back the amount thus paid, unless such holder has suffered loss in consequence of the mistake. It is also held in this case that a mistake in recognizing a forged instrument as genuine is binding only when the forgery is such that it ought to have been discovered by a bare inspection of the instrument without reference to anything outside of it, not even to the memory of the party as to the obligations he had issued. This decision approves *Price* v. *Neal* and the case in 46 N. Y. *supra*.

*Mayer* v. *Mayer*, 63 N. Y. 455, is an ordinary case of paying money under mistake of fact.

In *First National Bank of Quincy* v. *Ricker*, 71 Ill. 439, the exception to the general rule is recognized that the drawee of a check is presumed to know the signature of the drawer, and if the drawee pays a forged check to the holder he will not be entitled to recover back the money so paid, where there has been no fraud practised upon him. But it was held that the drawee or payer of a forged bank-check can recover back the amount paid by him on it, when the holder or payee is himself at fault or has been guilty of fraudulent practices, which may have thrown the drawee off his guard.

*Welch* v. *Goodwin*, 123 Mass. 71, seems to have been decided without much consideration, and virtually overruled *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33, without noticing it and without referring to one of the many authorities we have cited. Lord, Judge, said :

" The question which we are called upon to decide is, whether under any circumstances, a party may recover back money upon a security being a forged signature of himself, supposing it at the time of payment to be his genuine signature. We can have no doubt that he may. This is entirely clear in case he was induced to make the payment by fraud or misrepresentation. Nor is it necessary that fraud or

misrepresentation should exist. An innocent mistake whether arising from natural or temporary infirmity, or otherwise made without fault on his part, entitles him to the same relief. How far this right would be affected by neglect on his part to give prompt notice of the mistake or by any change affecting the situation or the rights of the persons to whom the payment is made we are not called upon to consider. Here notice was given immediately upon discovering the forgery. Whatever securities were given up by the defendant in consideration of the receipt of the forged note had been given up before the payment was made."

It seems to us from the review of the authorities, that it is a rule of commercial law too firmly established to be shaken, being sustained by an unbroken line of authorities for more than a century, that the drawee of a bill of exchange is presumed to know the hand-writing of the drawer, and *a fortiori* the maker of a negotiable note is presumed to know his own signature, and if the drawee accepts or pays the bill, or the maker pays the negotiable note, in the hands of a *bona fide* holder, to which the drawer's or maker's name has been forged, he is bound by the act and can not recover back the money so paid.   It is essential to the business-interests of the country, that there shall be certainty in commercial transactions ; that the mercantile law shall be firm and stable never varying, so that those, who deal in commercial paper, may know what their rights are.   Of course a drawee or maker of commercial paper may by the exercise of due care protect himself against losses by forgery, and if he pays such paper, the law imputes to him negligence in so doing, and he can not after such payment throw the loss upon the holder of such paper.   But it is said the holder of such paper should not be permitted to hold the money so paid, unless he has been placed in a worse situation thereby and has suffered actual loss ; under such circumstances the law presumes he has been placed in a worse situation and would be injured, if he had to pay the money back.   The law presumes a loss, and it need not be proved.   Mr. Justice Story says in *United States Bank* v. *Bank of Georgia*, 10 Wheat. 356 :

" It is sufficient for us to declare that we place our judgment in the present case upon the ground, that the defendants

were bound to know their own notes and having received them without objection they can not now recall their assent. We think this doctrine founded on public policy and convenience; and that actual loss is not necessary to be proved, for potential loss may exist, and the law will always presume a possible loss in cases of this nature."

But it is said, that Johnston did not see the note before he paid it. So much greater was the negligence the law imputes to him. He had every opportunity to see the note. Atwater, judge, in delivering the opinion of the court in 2 Minn. p. 84, says:

" If the drawee is allowed to recover on payment of a forged draft, because he has not seen it, he would probably never care to see a draft before payment, but even when presented at his counter and he present, would direct his clerk to pay it, and afterwards take advantage of his own *laches* to enforce a recovery. To admit this would be to overthrow the long settled principles of law and require the holder instead of the drawee to guarantee the signature of the drawer, which manifestly would be most unjust and inequitable and destructive of commercial business."

It is unnecessary to pursue this discussion further. Johnston was clearly guilty of negligence in paying the note, and he cannot throw the loss on the Commercial Bank, which was without fault in the premises. He not only did not examine the note, before he paid it, but did not examine it for several days afterwards and did not seem to be certain it was a forgery, until he had examined the books of the Riverside Furniture Company. This was on the 9th day of April, seven days after he had paid the note. He then went to the sick man's room, charged him with the forgery and gave him time to pay him the money back or to secure it; gave him until the 11th and then extended the time until the 14th, and his attorney, at his instance, wrote Metzner a letter on the 10th of April, in which he said:

"In filling up the blank note to-day in your presence, I inadvertently inserted Mr. Johnston's name as payee instead of your own, which would require Mr. Johnston's indorsement before the note could be discounted. What we want is the money without Mr. Johnston incurring any liability

whatever. I here within send you another blank note made payable to yourself, which you can execute, or any other you may see fit, that will accomplish the desired result. We sincerely trust that you will send the amount of money named without fail by to-morrow evening, or have the bank telegraph us that the same is on deposit subject to Mr. Johnston's order. By so doing you may rest assured that the matter will end here, and that no further mention will be made of the transaction to any one.

"Very respectfully,

"C. W. CARROLL."

The court refused to admit this letter. It ought to have been admitted as showing, that the plaintiff did not contemplate holding the Commercial Bank, as the other evidence shows he did not notify the bank until four days after Metzner's death. It was thirteen days after the note was paid and about nine days after the discovery of the forgery, before the bank was notified.

We think the first three instructions asked by defendant were substantially correct, and the plaintiff had no just ground of objection to them. They should have been given. The court did not err in refusing to give the fourth instruction: *State* v. *Betsall,* 11 W. Va. 703 ; *State* v. *Thompson,* 21 W. Va. 741.

The defendant might have moved to exclude the plaintiff's evidence, or could have demurred to the evidence after it was all before the jury. The instructions that were given for the reasons herein set forth did not propound the law correctly and should not have been given. The plaintiff asked eight instructions, which the court refused; and the plaintiff excepted. The court very properly refused each and every of said eight instructions. The demurrer to the declaration was very properly overruled. No reason was assigned for it and we see none.

The judgment of the municipal court of Wheeling is reversed, the verdict of the jury set aside, and the case is remanded for a new trial.

REVERSED.   REMANDED.